# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 11, 2012 Session

## STATE OF TENNESSEE v. MARIE DELALUZ URBANO-URIOSTEGUI

### Appeal from the Criminal Court for Davidson County
### No. 2008-C-2186      Mark J. Fishburn, Judge

### No. M2012-00235-CCA-R3-CD - Filed May 6, 2013

A Davidson County grand jury indicted appellant, Marie Delaluz Urbano-Uriostegui, for one count of aggravated child abuse and one count of aggravated child neglect, both Class A felonies.  A jury found appellant guilty of aggravated child abuse and not guilty of aggravated child neglect.  The trial court sentenced appellant to serve sixteen years at 100% in the Tennessee Department of Correction.  In this appeal, appellant raises the following issues: (1) whether the evidence was sufficient to prove that appellant caused the victim's injuries; (2) whether the prosecutor's comments during closing arguments constituted reversible error; (3) whether the trial court erred by improperly admitting an expert in child maltreatment; (4) whether trial counsel provided ineffective assistance by failing to obtain a medical expert to testify on appellant's behalf; and (5) whether newly discovered evidence justifies a new trial.  Discerning no error in the proceedings, we affirm the judgment of the trial court.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROGER A. PAGE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Vincent P. Wyatt, Nashville, Tennessee, for the appellant, Marie Delaluz Urbano-Uriostegui.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Smith, Associate Deputy Attorney General; Cameron L. Hyder, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Kristen Menke and Sharon Reddick, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Procedural History and Facts

This case relates to the substantial head injuries suffered by A.B.,[1] on May 5, 2008, while he was in the care of appellant, who is married to A.B.'s uncle. This case was tried in May 2010, and the jury found appellant guilty of aggravated child abuse but not guilty of aggravated child neglect. The trial court sentenced appellant on September 16, 2010, to a sixteen-year sentence. The appellant filed a timely motion for new trial, which included an allegation that appellant's trial counsel provided ineffective assistance of counsel. The trial court held a hearing on the motion for new trial and allowed appellant to present evidence on the issue of ineffective assistance of counsel in the nature of a post-conviction hearing. The trial court denied the motion for new trial by written order filed on January 24, 2012, and denied relief based on ineffective assistance of counsel in a separate written order filed on January 25, 2012. This appeal followed.

### A. Trial

The State's first witness was A.B.'s mother, Marisol Romero. She testified that A.B. was born on March 10, 2006, and appellant was the victim's aunt. Appellant watched A.B. while Ms. Romero was at work. Ms. Romero stated that appellant also took care of her own child and a niece at the same time. According to Ms. Romero, A.B. was generally healthy prior to May 5, 2008, the offense date. He bumped his head in November 2007, which resulted in a visit to the emergency room at Southern Hills Medical Center ("Southern Hills"), where the staff applied adhesive and gauze to the wound. A.B. cried from the time he bumped his head until he returned home from the emergency room. After that incident, his behavior and health were normal, and his pediatrician assured Ms. Romero that A.B. "was fine." Ms. Romero said that A.B. had a habit of overeating, and he would occasionally vomit as a result. In March 2008, A.B. had his two-year check-up, and everything appeared normal.

On the night of May 4, 2008, A.B. had vomited due to overeating. Ms. Romero was concerned that he might develop a fever the following day, so on May 5, 2008, she packed Tylenol in his bag for appellant to administer if A.B. became feverish. Ms. Romero testified that on May 5, 2008, A.B. acted "normal." He did not have any accidents, and neither she nor her husband hurt him that morning. Ms. Romero took him to appellant's house just after 7:00 a.m. Appellant was the only adult in the house.

---

[1] It is the policy of this court to refer to minor victims by their initials.

Later that day, Ms. Romero's husband called her and told her that A.B. was sick. Ms. Romero said that she had not heard from appellant all day, and she testified that she had her cellular telephone with her and that it was in working order. She left work after her husband called and went directly to appellant's home, a trip of approximately twenty minutes. While en route, she called appellant to find out what happened. Appellant told her that A.B. was sick, that he had vomited, and that he was having trouble breathing. Ms. Romero called A.B.'s pediatrician to make an appointment after she spoke with appellant. When Ms. Romero arrived at appellant's apartment, appellant was crying, and A.B. "was on a chair . . . cold, stiff[,] and unconscious." Appellant had not called 9-1-1 and had not told Ms. Romero that 9-1-1 should be called. Ms. Romero picked up A.B., placed him in her car, and drove him to the nearest hospital, Southern Hills.

When Ms. Romero arrived at Southern Hills with A.B., the doctors asked what happened to him. She called appellant for her to explain what happened. Appellant told her that A.B. "wanted to go to sleep, but she [had] given him something to eat before that[,] and after that she went to the bathroom and when she came back[,] [A.B.] was not well." Ms. Romero testified that A.B. stayed at the Southern Hills emergency room for approximately twenty minutes, but the staff was unable to treat him. They transferred him to Vanderbilt Children's Hospital ("Vanderbilt") by helicopter. A.B. was hospitalized at Vanderbilt for three weeks. During that time, Ms. Romero spoke with representatives from the Department of Children's Services ("DCS") and the police department several times. According to her, appellant never gave her more information about what happened to A.B. while he was at appellant's home.

After A.B. was released from Vanderbilt, he went to Atlanta for two weeks for rehabilitation. Following his return to Nashville, Ms. Romero and her husband took him to physical and occupational therapy two times per week at a children's rehabilitation clinic. Ms. Romero said that A.B. had to relearn how to walk and how to use his right hand. He had also lost his ability to use all the words he had previously learned, so he had to relearn those as well. After nine months of therapy, "he walked again, spoke again, and began playing like a normal child."

On cross-examination, Ms. Romero testified that A.B. vomited around 9:00 p.m. on May 4, 2008, and he slept well that night except that he woke up around 3:00 a.m. He cried for awhile and returned to sleep. Ms. Romero said that when she took A.B. to appellant's home, she asked appellant to call her if anything happened and to give A.B. Tylenol if he had fever. Ms. Romero viewed telephone records showing that appellant called Ms. Romero at 2:22:04, 2:22:18, and 2:23:44, but Ms. Romero said that she did not recall receiving those telephone calls. She explained that she "never received that call and not because [she] did not want to answer it, but [because she] did not see it or hear it."

Ms. Romero testified that appellant had been babysitting A.B. for three months prior to May 5, 2008. Ms. Romero agreed that she "never saw anything that caused [her] concern" during that time period. She agreed that appellant did not have a car and did not know how to drive. Ms. Romero testified that two adult family members, a cousin and a brother, lived with her and her husband.

On redirect examination, Ms. Romero testified that the adults who lived with her worked from 6:00 a.m. until 8:00 p.m. She agreed that appellant called her three times within one minute on May 5th, and she called appellant back three minutes later. Ms. Romero explained that she had already talked to her husband and had to turn in her time card before she left work. She called appellant back when she was in her car.

Antolin Barrera testified that he is A.B.'s father and Marisol Romero's husband. Appellant is married to Mr. Barrera's brother. During May 2008, Mr. Barrera worked in construction and would leave home around 6:00 a.m. to go to work. Because Ms. Romero was also working, appellant would watch A.B. On May 4, 2008, Mr. Barrera did not work, so he spent time with A.B. He behaved normally and did not have "any major accidents or falls." Mr. Barrera testified that when he left home on May 5, 2008, A.B. was still asleep. That afternoon, Mr. Barrera's brother called him to relay a message from appellant that A.B. was not doing well and that he should call Ms. Romero to see if she could take A.B. to the pediatrician. His brother did not indicate that A.B. might need an ambulance. Mr. Barrera said that he called his wife and did not have any trouble getting in touch with her. He left work and came back to Nashville after Ms. Romero had picked up A.B. and taken him to Southern Hills. Mr. Barrera recalled going to Southern Hills and then to Vanderbilt. He said that he talked with both DCS and the police department while at Vanderbilt and told them about A.B.'s injury in November 2007, when A.B. hit his head and went to the emergency room, opining that something similar might have happened on May 5th.

On cross-examination, Mr. Barrera recalled that he told a social worker at Vanderbilt and the police that A.B. had vomited around 9:00 p.m. on May 4, 2008.

Dr. Kartik Boorgu, a radiologist at Southern Hills, was accepted by the court as an expert in diagnostic and interventional radiology. He testified that he interpreted a CT scan of A.B.'s brain on May 5, 2008. He diagnosed A.B. with "a fairly substantial subdural hemorrhage that was actually compressing the brain and causing brain herniation." Dr. Boorgu further testified that the hemorrhage "had a layered appearance," so he characterized the hemorrhage as "acute on chronic," meaning that it appeared that there was fresh blood and older blood present. He said that it would be "hard for [him] to refute what the neurosurgeon found" if the neurosurgeon found only acute bleeding during an operation.

On cross-examination, Dr. Boorgu testified that it appeared to him that the hemorrhage contained "blood from two different times," indicating the possibility of two different injuries.

Dr. Linda Plummer, an emergency department physician at Southern Hills Medical Center, testified that she treated A.B. on May 5, 2008, and the trial court accepted her as an expert in emergency medicine. Dr. Plummer testified that A.B. "presented nonresponsive . . . and seizure was in progress, actively seizing." Initially, A.B. was breathing on his own, but he was not responding to verbal or painful stimuli. His left pupil was larger than his right, indicating that something was happening in his brain, even though at the time the cause was unknown. Dr. Plummer stated that A.B.'s temperature was 99.2, which was not high enough to cause a seizure. She was unable to do a neurologic examination because A.B. continued seizing. The staff induced paralysis to stop the seizure, sent A.B. for a CT scan, and informed Vanderbilt that A.B. would be transferred to them because Southern Hills did not have a pediatric intensive care unit. Dr. Plummer's involvement ended when Lifeflight transported A.B. to Vanderbilt. Dr. Plummer testified that she did not have any information about what happened to A.B. on May 5th that precipitated his visit to the emergency room, but she had noted that he received a head injury in November 2007.

On cross-examination, Dr. Plummer testified that A.B. had no external injuries. Her notes indicated that A.B. vomited at the babysitter's house before seizing. She agreed that vomiting could be a symptom of having pressure on the brain. Dr. Plummer further agreed that subdural hematomas can occur over time, with a delay of symptoms called a "lucid interval," the length of which was variable. She testified that she could not say when A.B. was injured.

Dr. Kyle Weaver, a neurosurgeon at Vanderbilt, was accepted by the court as an expert in traumatic brain injuries and neurosurgery. He testified that acute subdural hematomas in children were caused by nonaccidental trauma, falls from significant heights, and car crashes. He further testified that he treated A.B. on May 5, 2008. When he first saw A.B., his "illness was progressing very rapidly." A.B.'s brain was "putting pressure on the nerve that goes to his eye," and "he was also doing something that we call decerebrate posturing." Dr. Weaver demonstrated decerebrate posturing for the jury and explained "that it is a reflex [indicating] that a very low part of the brain level in the brain stem is being injured at the time." Dr. Weaver testified that he performed surgery on A.B., which required that he remove a portion of A.B.'s skull and cut into his brain. When he performed the surgery, Dr. Weaver saw no evidence of a chronic subdural hematoma, stating that there was no staining of the brain tissue or any of the blood products associated with chronic subdural hematomas. Instead, he found active bleeding, blood products associated with acute subdural hematomas, and a ruptured bridging vein. A.B. arrested during surgery, but resuscitative

efforts were successful. Dr. Weaver removed the hematoma and stopped the bleeding. He testified that A.B. recovered "much better" than he expected due to the seriousness of the injury. Dr. Weaver further testified that A.B. also had a subgaleal hematoma, meaning "blood between his skull and the inside of his scalp." According to Dr. Weaver, trauma is the only cause of subgaleal hematomas. Regarding Dr. Boorgu's interpretation of A.B.'s CT scan at Southern Hills, Dr. Weaver testified that an active bleed has a similar appearance to a chronic subdural hematoma, so what Dr. Boorgu saw as an acute on chronic subdural hematoma was actually a hyperacute (actively bleeding) on acute subdural hematoma.

When asked if, hypothetically, a child receiving the same type of injury as A.B. seven hours prior to displaying symptoms would behave normally in the intervening time between injury and becoming symptomatic, Dr. Weaver said that the hypothetical situation was unrealistic because ninety percent of children receiving that type of injury displayed symptoms immediately. Based on his experience and literature in the field, Dr. Weaver testified that he would expect a child receiving the type of injury received by A.B. to become symptomatic within two hours. Symptoms would include "being irritable, nauseated, vomiting, [being] sleepy, [and] complaining of a headache." Dr. Weaver stated that A.B. could not have been bleeding at the rate he was bleeding during surgery for several hours because "most people, unless they have got some kind of bleeding disorder, which he did not, are going to stop." He testified that he would not expect to see neck or spinal injuries in a child who had a subdural hematoma due to a fall from a significant height, car crash, or nonaccidental trauma. He would expect to see retinal hemorrhages because they are caused by the same mechanisms as subdural hematomas, and he recalled that A.B. had retinal hemorrhages.

On cross-examination, Dr. Weaver testified that he could not say with certainty exactly when A.B. was injured but that he "guesstimate[d]" two to four hours before surgery. He defined the term "lucid interval" as the period of time between the injury and loss of consciousness, disagreeing with the defense's definition of "lucid interval" as the period of time between injury and becoming symptomatic. Dr. Weaver stated that he was aware of studies where children with eventually fatal subdural hematomas acted normally for a period of time after receiving the injury. However, he was not aware of Dr. John Plunkett's study that included children who died from subdural hematomas suffered after a fall from two to four feet and had a delay in the onset of symptoms of up to twelve hours. Regarding the subgaleal hematoma found during surgery, Dr. Weaver testified that it was not on the CT scan because the scalp was not visible in the scan. Dr. Weaver agreed that some conditions can mimic abuse, such as coagulopathy and infection, but on redirect examination, he stated that A.B. did not have coagulopathy, and there was no evidence that he had an infection.

-6-

Dr. Geoffrey Fleming testified that he was a pediatric critical care physician at Vanderbilt University Medical Center. The court accepted Dr. Fleming as an expert in pediatric critical care. Dr. Fleming testified that he was the attending physician in the pediatric intensive care unit ("PICU") when A.B. was transferred to the unit after his surgery. He said that A.B. was "critically ill" when he came to the PICU. Dr. Fleming spoke with A.B.'s parents through a translator to obtain his history. A.B.'s parents told him about the head injury in November 2007. Dr. Fleming referred to that injury as "a relatively minor injury with simply a laceration repair." He testified that A.B.'s history did not coincide with the type of injury he had on May 5th, explaining that his injury was consistent with having "been pulled out of a car accident on I-65," not simply falling down. Dr. Fleming explained that "nonaccidental trauma" is a term used in pediatrics when there is a concern that another person injured the child and is "equivalent in many capacities" to the term "child abuse." He testified that he made the decision to consult Vanderbilt's care team when A.B. was admitted to the PICU. He explained that the care team, which consists of general pediatricians who treat patients at Vanderbilt, is "Vanderbilt's representative in that arena of looking for signs of maltreatment." Dr. Fleming said that the care team's interim director, Dr. Lisa Piercey, has additional expertise in the area of child maltreatment.

Dr. Lisa Piercey testified that she is the medical director of the child maltreatment program at Vanderbilt Children's Hospital, the director of the child protection team at Jackson-Madison County General Hospital, and the medical director of the Madison County Child Advocacy Center. She did a special focus in child maltreatment during her pediatric residency and participated in 100 to 120 hours of continuing education each year in child maltreatment. She testified that she was involved in training other doctors in the field and lectured for approximately fifty hours each year. She further testified that she has treated over 1000 children with traumatic brain injuries. Dr. Piercey said that she has previously been accepted by courts in Tennessee as an expert in child maltreatment. At the time of trial, she had not taken the examination to be board-certified in child maltreatment. She explained that the very first board certification examination was the November prior to trial, and she would be sitting for the examination during the November following the trial. According to Dr. Piercey, no one in Tennessee was board-certified in child maltreatment as of the time of trial. Over the defendant's objection, the court accepted Dr. Piercey as an expert in pediatrics and child maltreatment.

Dr. Piercey testified that the child maltreatment team at Vanderbilt consulted on any case with suspected abuse or neglect. She said that over the last three years at Vanderbilt, the team had determined that the findings were consistent with abuse forty-five percent of the time, while fifty-five percent of the time there was a medical explanation or accidental trauma. She personally consulted on A.B.'s case, which included observing A.B. and reviewing all of his records from Vanderbilt, Southern Hills, and his general pediatrician.

Her assessment was that A.B. "had sustained severe life-threatening head trauma that was inflicted in nature." Dr. Piercey categorized A.B.'s subdural hematoma as a shearing injury caused when the brain and the dura are forced apart. She said that the subgaleal hematoma between A.B.'s skull and scalp could have been caused by "a significant impact" or "very forceful hair pulling." The retinal hemorrhages would have been caused by the same shearing motion that caused the subdural hematoma. According to Dr. Piercey, retinal hemorrhages are almost always caused by inflicted trauma, and the subdural hematoma, the subgaleal hematoma, and the retinal hemorrhages taken together had "a very[,] very high correlation with inflicted trauma." Dr. Piercey opined that there were three reasons why it was plausible for a small adult woman to have been able to inflict those injuries on a thirty-pound child: (1) anyone with "normal adult strength" could inflict those injuries; (2) even a 100-pound adult would be three times A.B.'s size and would have correspondingly more strength; and (3) very young children do not have the experience to be able to anticipate trauma and react to protect themselves. She further opined that the force required to inflict the injuries "[was] significant direct force that . . . would be very frightful to an observer and it would be very obvious to someone that it [was] not a normal or safe way to handle a child." Dr. Piercey testified that the type of force could not be "generated by the child on their own" or through "household accidents." According to Dr. Piercey, the injury A.B. received in November 2007 was in no way relevant to the head trauma he received in May 2008. Dr. Piercey reviewed A.B.'s visits to his pediatrician and saw nothing of concern neurologically.

Regarding the timing of the injuries, Dr. Piercey testified, based on the literature in the field, that a child who suffered from a subdural hematoma of the magnitude that A.B. had sustained would become symptomatic "within seconds to minutes." That fact, taken together with the fact that A.B. was still actively bleeding when Dr. Weaver operated on him, suggested to Dr. Piercey that A.B. was injured five to ten minutes prior to 2:00 p.m., which was when his symptoms reportedly began. She opined that a delay of twenty minutes between onset of symptoms and seeking medical attention increased the likelihood of death or of never regaining normal functioning.

On cross-examination, Dr. Piercey testified that she was familiar with Dr. John Plunkett's study regarding child deaths resulting from short falls. After reviewing Dr. Plunkett's article and an article by Dr. Gregory Reiber, both of which the trial court entered as exhibits, Dr. Piercey categorized the situations in which children died from short falls as "freak accidents."

On re-direct examination, Dr. Piercey testified that Dr. Plunkett was a well-paid physician who traveled the country testifying as a defense witness. She agreed that there were "voluminous articles" contradicting Dr. Plunkett's article, and she said that she

"literally ha[d] an entire file drawer dedicated to such articles." She said that her favorite article was written by Dr. David Chadwick. She described the article as follows:

> It was a great article where he and obviously a very large team of his cohorts got daycare footage . . . from the security cameras at daycares and looked at short falls of toddlers . . . because that is what they do . . . while they are learning to walk[,] and so he looked at one million . . . children in daycare with witnessed short falls from [the] video surveillance and [one] died[,] and so his conclusion was that in . . . objectively[-]witnessed falls, short falls in young children[,] the [incidence] is the proverbial one in a million, literally.

Detective Thomas Rollins of the Metropolitan Nashville Police Department youth services division testified that a DCS employee called him on May 5, 2008, regarding A.B.'s injury. When he arrived at Vanderbilt, A.B. was in surgery. Detective Rollins testified that he spoke with the DCS employee, medical staff and social workers employed by Vanderbilt, and A.B.'s parents. An interpreter helped him interview A.B.'s parents. Eventually, his investigation led him to interview appellant at her home on May 8, 2008. He said that he had not developed a suspect at that time, but he wanted to interview appellant because she had been A.B.'s caretaker on the date that he was injured. An interpreter and a DCS employee were also present when he interviewed appellant. Appellant told Detective Rollins that A.B.'s mother dropped him off at 7:30 a.m. and placed him on the couch. Appellant fed him breakfast thirty minutes later, and she fed him lunch between 11:30 a.m. and noon. Appellant reported that A.B. walked to the eating area and fed himself both times. He watched T.V. after lunch. She did not say anything about A.B. vomiting. At approximately 1:00 p.m., appellant gave her own child a bath in the bathroom, and she was away from A.B. for thirty minutes. When she returned, A.B. "was shaking, going unconscious." Appellant called A.B.'s mother, but "she could not get a hold of the mother because the phone was disconnected." Next, she called her husband and her sister. He gathered from the interview that appellant was the only adult in the home with A.B. that day after his mother dropped him off. Detective Rollins said that to his knowledge, appellant made no effort to call 9-1-1. He testified that according to appellant's telephone records, from 2:03 p.m. until 2:22 p.m., there were five calls between appellant and her husband and two calls between appellant and her sister. She did not attempt to call Marisol Romero, A.B.'s mother, until 2:22 p.m. Appellant never indicated that she attempted any life-saving measures between the time that she discovered A.B.'s seizing on the couch and when his mother picked him up. Detective Rollins testified that he developed appellant as a suspect and presented the case to both the care team at Vanderbilt and the Child Protective Investigative Team.

The State rested its case-in-chief. Appellant then called Clara Urbano, appellant's sister, to testify on her behalf. Clara Urbano testified that appellant called her on May 5,

2008. Appellant was upset because A.B. was sick. Appellant's husband, Alberto Barrera, also testified that appellant called him on May 5, 2008, because she was concerned that A.B. was sick. Alberto Barrera said that he told appellant not to call Marisol Romero. His reasoning was that Ms. Romero was pregnant and was a new driver, and if appellant told her that A.B. was sick, she might rush over to appellant's house and cause a car accident. Alberto Barrera told appellant that he would call Antolin Barrera, his brother and A.B.'s father, to see whether he could leave work to check on A.B. According to Alberto Barrera, the second time he talked to his brother, Antolin Barrera had already called Ms. Romero, who was on the way to appellant's home. Alberto Barrera testified that he visited A.B. at Vanderbilt, but appellant never did. He further testified that he saw A.B. on May 4, 2008, in the afternoon and that A.B. appeared normal at that time.

Appellant testified that she did not hit, strike, or shake A.B. on May 5, 2008. She said that A.B. appeared "sad, sleepy" when Ms. Romero dropped him off that morning. Appellant concluded that A.B. was "not healthy." She laid him on the couch before and after each meal. After lunch, her own child had diarrhea, and she spent thirty minutes cleaning him in the bathroom. Appellant did not hear anything from the living room, where A.B. was lying on the couch, during that time. When she returned to the living room, A.B. was "not reacting well." She said that he had extended his arms and feet, and his eyes were rolled back. She tried talking to him, but he did not react. She called her husband, who told her not to call Ms. Romero and said that he would call A.B.'s father. Appellant testified that she did not call 9-1-1 and that she did not drive A.B. to the hospital because she did not know how to drive. At her husband's suggestion, she applied wet towels to A.B. and rubbed alcohol on his chest and on his nostrils. Appellant said that she tried to call Ms. Romero, but Ms. Romero's telephone "sounded like it was turned off." She then called her sister because her sister worked in the same hotel as Ms. Romero. Appellant said that she asked her sister to look for Ms. Romero and to "tell her to come soon because the child was not doing well." Appellant testified that she spoke with the police when they came to her house. She said that the interpreter was difficult to understand. She agreed that she may have been mistaken when she told the police that she called Ms. Romero before she called her husband.

On cross-examination, appellant testified that she did not go to see A.B. at the hospital because her child was sick and she could not ask her sisters to watch him while she went to visit because they were working.

Following deliberations, the jury found the appellant guilty of aggravated child abuse and not guilty of aggravated child neglect. The trial court sentenced appellant to serve sixteen years at 100% in the Tennessee Department of Correction.

## B. Motion for New Trial

Appellant filed a timely motion for new trial alleging that the evidence was insufficient to support the verdict and requesting that the trial court, acting as thirteenth juror, grant appellant a new trial. On May 9, 2011, appellant filed an amended motion for new trial, which included new allegations that: (1) the prosecutor's comments during closing arguments prejudiced the jury and amounted to reversible error; (2) the trial court erred by accepting Dr. Piercey as an expert in child maltreatment; (3) the State impermissibly bolstered Dr. Piercey's credibility through Dr. Fleming's testimony; (4) trial counsel provided ineffective assistance by failing to call a medical expert to challenge the State's theory that A.B.'s injuries were caused by nonaccidental trauma while in the care of appellant; and (5) newly discovered evidence justified a new trial. The trial court held a hearing on the motion for new trial on July 13, 2011, and allowed appellant to present evidence as to the issue of ineffective assistance of counsel in the nature of a post-conviction hearing.

Appellant's trial counsel testified that appellant's family retained her to represent appellant at trial. She said that she found it difficult to obtain an expert to testify on behalf of the appellant in Nashville because she learned that "Vanderbilt doctors do not testify against Vanderbilt doctors." She e-mailed doctors at two university hospitals similar to Vanderbilt, hoping to find "an equivalent, maybe in another state, that would be a good fit." Appellant's husband contacted the Mexican consulate, and attorneys for the consulate found Dr. Ronald Wright, a pathologist, and hired him. Trial counsel reviewed Dr. Wright's curriculum vitae after the Mexican consulate retained him. She said that she would have preferred to find someone "more oriented towards children." Trial counsel said that she had not handled a brain injury case before, so she read literature about brain injuries in abuse cases and enlisted another attorney, hereinafter called "co-counsel," who had prior experience with similar cases, to help her handle the medical side of the case. By reading the literature in the field, she learned that the field was divided about shaken baby syndrome. Trial counsel testified that Dr. Wright wrote his opinion prior to reviewing all of the evidence, was a difficult person, and "was actually rude." She "felt like [she] was stuck with him" because she was limited to the funds provided by the Mexican consulate. She did not petition the trial court for funds to hire an expert. Trial counsel testified that Dr. Wright was in Nashville during the trial, along with an attorney from the Mexican consulate. The attorney from the Mexican consulate met with Dr. Wright and reached the same conclusion as trial counsel that it would be detrimental to the case to have him testify. Trial counsel testified that co-counsel handled all of the cross-examination of the State's medical experts. Co-counsel had given trial counsel a recommendation for a medical expert, but the Mexican consulate was unable to afford that person's fee. Trial counsel said that she informed appellant of her reasoning when she decided not to call Dr. Wright as a witness. Trial

counsel explained that beyond the fact that she "did not feel like he would make a good witness," she knew that the State had prepared a rebuttal witness, Dr. McMasters, who "would just blow [Dr. Wright] away." Trial counsel said that she wished that she had been able to present a medical expert but that co-counsel thoroughly cross-examined the State's witnesses and placed articles into evidence that supported appellant's position.

On cross-examination, trial counsel testified that her search for a medical expert was interrupted by the Mexican consulate's retention of Dr. Wright and that the doctors who responded told her that they did not "do that line of work," meaning that they did not testify for defendants. She agreed that Dr. Wright was an experienced pathologist who had performed autopsies on people with traumatic injuries and was trained in "identifying accidental trauma versus inflicted trauma." She further agreed that Dr. McMasters had the same background as Dr. Wright. Trial counsel testified that common defense theories in similar cases included that the injured child had a slow bleed that became aggravated suddenly, that "a short fall or some kind of trivial trauma" caused the injury, and that shaken baby syndrome was overdiagnosed. She said that co-counsel cross-examined the State's medical experts about those theories and that Dr. Wright had presented all three theories in communications with her. Trial counsel said that she became frustrated with Dr. Wright when he refused to adjust his analysis after they learned that A.B. had been sick the night before he was in appellant's care. Trial counsel testified that the State's experts addressed all of the potential medical defenses either on direct examination or cross-examination. She said that she learned about the common defense theories prior to trial and recalled reading, prior to trial, an article in the New York Times about the dispute in the medical community regarding shaken baby syndrome.

On re-direct examination, trial counsel corrected herself to say that she read the New York Times article after trial. She said that she did not contact anyone mentioned in that article. Trial counsel stated that she was unaware that the medical community had become increasingly more critical towards shaken baby syndrome since the conclusion of appellant's trial.

Co-counsel testified that she became involved in the case after the consulate had retained Dr. Wright. Her only contact with Dr. Wright was through trial counsel. Co-counsel handled most of the cross-examination of the State's medical experts at trial. She said that she and trial counsel both handled pretrial interviews with the experts. Co-counsel agreed that she had concerns about Dr. Wright, explaining that his opinions were "where we wanted him to be" but that "[h]e wasn't communicating it to us in a way that [she] thought was going to help with a jury." She recalled having concerns about Dr. Wright "at least in the week before trial." Co-counsel said that she was aware of other experts that could have potentially been good defense witnesses but were "exorbitantly expensive."

-12-

On cross-examination, co-counsel testified that she had been familiar with the dispute in the medical community regarding shaken baby syndrome and head trauma well before trial. She agreed that potential defense experts had testified in courts regarding that dispute well before the trial in this case, as well.

The trial court took the motion for new trial under advisement. On January 24, 2012, the trial court issued a memorandum opinion denying appellant's motion. The trial court issued a separate opinion on January 25, 2012, in which it found that appellant had failed to show that trial counsel provided ineffective assistance of counsel.

## II. Analysis

On appeal, appellant raises the following issues: (1) whether the evidence was sufficient to show that appellant caused the victim's injuries; (2) whether the prosecutor's comments during closing arguments constituted reversible error; (3) whether the trial court erred by admitting Dr. Piercey as an expert in child maltreatment; (4) whether trial counsel provided ineffective assistance by failing to obtain a medical expert to testify on appellant's behalf; and (5) whether newly discovered evidence justifies a new trial.

### A. Sufficiency of the Evidence

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn.

1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).  This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence.  *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).  Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings.  *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

To sustain a conviction for Class A felony aggravated child abuse as charged in the indictment, the State must prove that appellant committed child abuse as defined in Tennessee Code Annotated section 39-15-401(a) and that the act of abuse resulted in serious bodily injury to a child under eight years of age.  Tenn. Code Ann. § 39-15-402(a)(1) (2006).  Child abuse is "knowingly, other than by accidental means, treat[ing] a child under eighteen (18) years of age in such a manner as to inflict injury."  *Id.* at § 39-15-401(a).  At the time of the victim's injury, serious bodily injury was defined as bodily injury that involved:

(A) A substantial risk of death;
(B) Protracted unconsciousness;
(C) Extreme physical pain;
(D) Protracted or obvious disfigurement; or
(E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty.

Tenn. Code Ann. § 39-11-106(a)(34)(A)-(E) (2006).

Viewed in the light most favorable to the State, the evidence shows that A.B. sustained serious bodily injury while in the care of appellant.  Witnesses testified that on May 4, 2008, A.B. was a normal, healthy two-year-old, but he overate that evening and subsequently vomited.  On May 5, 2008, A.B.'s mother, Marisol Romero, left him with appellant, who is his aunt by marriage, while she went to work.  Appellant was the only adult in the house the entire time that A.B. was there.  A.B. was walking and eating on his own during the morning.  In the afternoon, he began seizing, and appellant did not immediately contact A.B.'s mother, nor did she call 9-1-1.  Once appellant talked to Ms. Romero, she did not tell Ms. Romero that 9-1-1 should be called.  Ms. Romero found A.B. unconscious on appellant's couch.  She drove him to Southern Hills Medical Center, where the staff performed a CT scan and diagnosed him with an acute on chronic subdural hematoma.  They transferred him to Vanderbilt Children's Hospital, where Dr. Kyle Weaver performed surgery

on him. Dr. Weaver testified that he found a subgaleal hematoma during the operation and that the subdural hematoma was actually hyperacute on acute. He explained that A.B. was actively bleeding. A.B. arrested during the operation but was successfully resuscitated. According to Dr. Weaver, the fact that A.B. was actively bleeding and the rate at which he was bleeding limited the time frame in which A.B. could have been injured to a few hours because otherwise he would have died or stopped bleeding. Dr. Weaver testified that there were three possible causes of subdural hematomas in children A.B.'s age: nonaccidental trauma, a fall from a significant height, and a car crash. Dr. Fleming testified that A.B.'s injury was something he would more likely see from a victim of a car crash on the interstate. Dr. Fleming contacted Vanderbilt's care team because he was concerned by the fact that A.B.'s history did not match his injury. Dr. Piercey, the interim director of the care team, testified that the fact that A.B. had a subgaleal hematoma, a subdural hematoma, and retinal hemorrhages strongly suggested nonaccidental trauma. She said that A.B. could not have generated enough force on his own to cause his injuries but that even a small adult would have been strong enough. According to Dr. Piercey, the subgaleal hematoma was caused by an impact or by hair-pulling, and the retinal hemorrhages and subdural hematoma were caused by a shearing force. She testified that a child suffering from a subdural hematoma like A.B.'s would have become symptomatic within minutes of receiving the injury, and she opined that A.B. was injured a few minutes prior to 2:00 p.m. Detective Rollins testified that he developed appellant as a suspect because she was A.B.'s caretaker during the time the doctors stated he was injured.

From this evidence, a rational juror could have found that appellant caused the injuries to A.B. He appeared to be healthy when his mother left him with appellant, and appellant was the only adult in the house. Appellant did not call 9-1-1 when A.B. began seizing, and she did not immediately call Ms. Romero, contrary to what she told Detective Rollins. The medical evidence suggested that A.B.'s injuries were caused by inflicted trauma. Accordingly, we conclude that the evidence was sufficient to support appellant's conviction, and she is not entitled to relief on this issue.

## B. Prosecutorial Misconduct

Appellant contends that the State engaged in prosecutorial misconduct during its closing arguments when it referenced Dr. Piercey's testimony regarding articles not submitted into evidence and the "one in a million" study. The State responds that appellant waived the issue by not objecting at trial. However, appellant argues that the remarks constituted plain error.

Because closing argument is considered "an important tool for the parties during the trial process[,] . . . attorneys are usually given wide latitude in the scope of their

arguments[.]" *State v. Carruthers*, 35 S.W.3d 516, 577-78 (Tenn. 2000). However, "[a]rgument must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *Id.* at 578 (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)). To constitute reversible error, statements made in closing argument must be improper, and if improper, the impropriety must have affected the verdict to the prejudice of the appellant. *See Carruthers*, 35 S.W.3d at 578; *see also State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). The Tennessee Supreme Court has recognized the following factors for courts to consider when making this determination:

> 1) the conduct complained of, viewed in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecutor; 3) the intent of the prosecutor in making the improper statement; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength or weakness of the case.

*Carruthers*, 35 S.W.3d at 578. Furthermore, this court has recognized the following five areas of prosecutorial misconduct in closing argument:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.
> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
> 4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.
> 5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

"[W]here a prosecuting attorney makes allegedly objectionable remarks during closing argument, but no contemporaneous objection is made, the complaining defendant is not entitled to relief on appeal unless the remarks constitute 'plain error.'" *State v. Thomas*, 158

S.W.3d 361, 413 (Tenn. 2005); *see* Tenn. R. App. P. 36. Our supreme court formally adopted this court's *Adkisson* test for reviewing claims of plain error:

> The Court of Criminal Appeals has developed five factors to consider when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established by the record before a court will find plain error. *Id.* at 282. Complete consideration of all the factors is not necessary when clearly at least one of the factors cannot be established by the record.

Based on our review of the record, we determine that consideration of this issue under plain error review is not "necessary to do substantial justice." *Id.* The State, in its closing argument, mentioned that Dr. Piercey testified that she had access to many articles that could refute the studies presented by appellant. The State also mentioned Dr. Piercey's discussion of a study where one child out of one million observed died from a short fall. Both statements are fair and reasonable reflections of Dr. Piercey's testimony, and even if improper, the statements did not reach such a level of impropriety that the verdict was affected.

## C. Expert Testimony

Appellant contests the trial court's admission of Dr. Lisa Piercey as an expert in the field of child maltreatment. She argues that Dr. Piercey should have been admitted as an expert in pediatrics only.

We begin our analysis with the proposition that admissibility of expert testimony is governed by the Tennessee Rules of Evidence:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

-17-

Tenn. R. Evid. 702. The trial court is vested with broad discretion in resolving questions regarding the admissibility of expert testimony. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). On appellate review, we will not disturb a trial court's decision regarding the admission or exclusion of expert testimony absent an abuse of discretion. *State v. Scott,* 275 S.W.3d 395, 404 (Tenn. 2009); *see State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002). A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

During the voir dire of Dr. Lisa Piercey, she testified that she was the medical director of the child maltreatment program at Vanderbilt Children's Hospital; she did a special focus in child maltreatment during her pediatric residency; she participated in 100 to 120 hours of continuing education each year in child maltreatment; she trained other doctors in the field; and she had treated over 1000 children with traumatic brain injuries. Dr. Piercey had previously been accepted by courts in Tennessee as an expert in child maltreatment. *See State v. Joseph Ray Pinson*, W2008-01010-CCA-R3-CD, 2010 WL 1444471, at *1 (Tenn. Crim. App. Apr. 9, 2010); *State v. Jeffrey Gaylon Douglas*, W2010-00986-CCA-R3-CD, 2011 WL 915052 (Tenn. Crim. App. Mar. 16, 2011), *perm. app. denied* (May 25, 2011). At the time of trial, she had not taken the examination to be board-certified in child maltreatment; however, no one else in Tennessee was board-certified in child maltreatment as of the time of trial, either. Based on these qualifications, it was not illogical for the trial court to accept her as an expert in the field of child maltreatment. We conclude that the trial court did not abuse its discretion; therefore, appellant is without relief as to this issue.

### D. Ineffective Assistance of Counsel

Appellant argues that trial counsel provided unconstitutionally ineffective assistance when she failed to present a medical expert to rebut the State's medical proof. The State responds that appellant has failed to show by clear and convincing evidence that she received ineffective assistance of counsel.[2]

Initially, we note that this court has repeatedly warned appellants against presenting claims of ineffective assistance of counsel on direct appeal because (1) it may be difficult to establish ineffective assistance without an evidentiary hearing and (2) raising the issue on

---

[2] Tennessee Code Annotated section 40-30-110(f) provides that a claimant must prove *factual allegations* by clear and convincing evidence. (Emphasis added). In this case, the State wrongfully asserts that the appellant failed to prove her claim of ineffective assistance of counsel by clear and convincing evidence rather than that she did not prove her factual allegations by clear and convincing evidence.

direct appeal bars appellant from raising the issue in a post-conviction petition. *See State v. Anderson*, 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992); *State v. Thomas D. Taylor*, No. E2011-00500-CCA-R3-CD, 2012 WL 6682014, at \*9 (Tenn. Crim. App. Dec. 21, 2012). However, in this case, the first reason for caution has been mitigated because the trial court used the motion for new trial hearing as an evidentiary hearing for appellant's claim of ineffective assistance.

A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2012). The same standard applies when an appellant raises the claim of ineffective assistance of counsel on direct appeal. *State v. Burns*, 6 S.W.3d 453, 461 n. 5 (Tenn.1999) (*citing Anderson*, 835 S.W.2d at 607). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the trial judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The trial court's findings of fact are conclusive on appeal unless the preponderance of the evidence is otherwise. *Berry v. State*, 366 S.W.3d 160, 169 (Tenn. Crim. App. 2011) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App.1997)). However, conclusions of law receive no presumption of correctness on appeal. *Id.* (citing *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001)). As a mixed question of law and fact, this court's review of appellant's ineffective assistance of counsel claim is de novo with no presumption of correctness. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (citations omitted).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. 2004) (citing *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975)). When a petitioner claims that he received ineffective assistance of counsel, he must demonstrate both that his lawyer's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007) (citations omitted). It follows that if this court holds that either prong is not met, we are not compelled to consider the other prong. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

To prove that counsel's performance was deficient, appellant must establish that her attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006)). As our supreme court has previously held:

> "[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations."

*Id.* at 315-16 (quoting *Baxter*, 523 S.W.2d at 934-35). On appellate review of trial counsel's performance, this court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689).

To prove that appellant suffered prejudice as a result of counsel's deficient performance, she "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn*, 202 S.W.3d at 116 (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). As such, appellant must establish that her attorney's deficient performance was of such magnitude that she was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

At the motion for new trial hearing, trial counsel testified that her search for an expert was stymied when the Mexican consulate hired Dr. Wright to testify on appellant's behalf. Trial counsel associated co-counsel on the case because of co-counsel's experience with the medical issues presented in this case. Both trial counsel and co-counsel testified that Dr. Wright's opinions tracked with their defense theories but that his testimony could have been detrimental to appellant because of his demeanor. In consultation with an attorney from the Mexican consulate and co-counsel, trial counsel decided not to present Dr. Wright to the jury. The trial court accredited her testimony and found that trial counsel made a tactical decision not to present Dr. Wright. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). As the evidence does not preponderate against the trial court's finding, we conclude

that trial counsel's performance was not deficient when she decided not to call Dr. Wright as a witness.

Appellant contends that trial counsel should have called another medical expert once she decided not to call Dr. Wright. It is apparent from the testimony that trial counsel made the decision not to call Dr. Wright in the midst of the trial, so logically, the time to find another expert would have been extremely limited. At the hearing, trial counsel testified that in her initial search for an expert, she did not find anyone who was willing to testify for the defense. Co-counsel testified that she recommended an expert but that the expert charged more than the budget allowed. Attached as exhibits to her motion for new trial, appellant presented affidavits of Dr. Wright and Dr. John Galaznik, a pediatrician specializing in child abuse cases.[3] The affidavits from Drs. Wright and Galaznik described the substance of what their testimony would have been at trial, and both questioned the timing of the injury and Dr. Weaver's finding of a hyperacute on acute subdural hematoma, among other issues. Trial counsel and co-counsel testified that co-counsel was able to present their defense theories, which included the theories presented by Drs. Wright and Galaznik, through rigorous cross-examination of the State's medical experts and medical literature supporting their theories. The trial court found that trial counsel's performance was not deficient when she did not call any medical expert, and we agree. Trial counsel made a reasonable effort to find an expert and made a tactical choice to present the defense theories through cross-examination and medical literature; therefore, we conclude that appellant has failed to show that she received ineffective assistance at trial.

E. Newly Discovered Evidence

Appellant contends that the trial court erred by denying her motion for new trial on the basis of newly discovered evidence. The State responds that the evidence was available prior to trial and would not have changed the result of the trial.

"To obtain a new trial on the basis of newly discovered evidence, the defendant must establish (1) reasonable diligence in seeking the newly discovered evidence; (2) materiality of the evidence; and (3) that the evidence will likely change the result of the trial." *State v. Nichols*, 877 S.W.2d 722, 737 (Tenn. 1994). "The granting or refusing of a new trial upon

---

[3] The State contends that appellant should have presented the doctors as witnesses at the hearing and that she cannot prove prejudice by merely submitting affidavits of potential witnesses. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). However, this court has on occasion treated affidavits from potential witnesses as sufficient. *Thomas Nathaniel Allen v. State*, E2010-01971-CCA-R3-PC, 2012 WL 826522 (Tenn. Crim. App. Mar. 13, 2012), *perm. app. denied* (Tenn. 2012) (citations omitted).

the basis of newly discovered evidence rests within the sound discretion of the trial court." *Hawkins v. State*, 417 S.W.2d 774, 778 (Tenn. 1967).

Appellant presented a New York Times article dated February 6, 2011, and Dr. Galaznik's affidavit as "newly discovered evidence." The trial court found that the evidence merely showed that the debate about shaken baby syndrome had intensified since the trial, but the underlying studies and issues remained the same. Trial counsel and co-counsel testified that they were familiar with the debate prior to trial. The record shows that the basic issues surrounding the debate were presented at trial. Therefore, we conclude that the trial court did not abuse its discretion in finding that appellant's evidence was not "newly discovered."

## CONCLUSION

Based on the record, the oral arguments, the parties' briefs, and controlling case law, we affirm the judgment of the trial court.

_____
ROGER A. PAGE, JUDGE